Good morning. My name is Jeremy Yellen, and it's my honor to be here representing Raymond Lamere in front of this court. I would like to reserve three minutes, if I could, for rebuttal. Raymond Lamere is suffering from three substantial errors at trial, separately or together, denied him a fair trial. The first that I've set forth in the brief is the oath issue. I will concede up front that I did not object when the court failed to give the oath, and I didn't know if I missed it, frankly, during the trial. In fact, I had to check with Mr. Carroll during the break and say, did he not give the oath? And, of course, Mr. Carroll confirmed it, and then... In the state of Montana, a structural error, I think it may very well be. But the Supreme Court's not been very generous in extending the concept of structural error. Why is a failure to administer a precise oath to a youth approach anything like that? Well, I think that if one looks at Rule 603, the court does not have to give an oath, but it has to make sure that it gives something that is in a form calculated to awaken the witness's conscience. And I think in reviewing the transcript, and frankly, at the time of the trial, I didn't grasp it, but the court asked this witness to speak out loud, and four times the witness thereafter just nodded affirmatively. The point of that is that the witness didn't even grasp the concept that you have to speak aloud, and then, of course, at one point, the court said, well, you promised to tell the truth or something to that effect, and she said no, and then the judge said, well, you tell the truth, and she said yes. I think that the point of it is that this witness, in my humble estimation, did not grasp the severity of it, and I think the record of that is fairly clear. So I think that whether the objection was made spontaneously or at later point, I still think that given Judge Haddam's reaction to my raising of that issue, negates the plain error analysis in my view. But even if it doesn't, I think that this is such a serious component and necessity of a citizen-accused rights that a person have, at a minimum, some kind of awakening of their conscience, and that didn't happen here. What exactly did Judge Haddam tell her? Judge Haddam, and if Your Honor, I have it at excerpt of the record. I apologize. I realize that perhaps photocopying four and one is hard to read for most. It is for me. Page 140, which is excerpt of the record 141. The judge first asked her, so you speak real clearly, will you do that for me? And then he asked her to, he says, we're going to ask you some questions. Can you do that? She says. She nods her head. This is, the judge says, I need you to say yes. She again nods her head on page 139. Do you know what it means to tell the truth? She says, yeah. Do you know what it means to tell a lie? Nods head again, in spite of the fact the judge said you have to answer verbally. You need to say out loud. She says, yeah, all right. And then it goes on to say, when those questions are asked, do you promise us that you'll tell the truth? She says, yeah. And will you, this is interesting. And will you promise us that you will not lie about anything? She says, no. And, of course, it goes from there. And the interesting thing is, in my research, I found that D.C. Circuit case, Spagnuolo, which talks about the court there said, do you know what happens if you don't tell the truth? And that gets to the crux of it. And the witness in that case, the trial witness in that case said, you get in trouble. So I think that that's structural error in a state court. I'd be jumping up and down about it. Here I think it's a deprivation of the Sixth Amendment right to confront the witness under oath. If I can move on to the next component, because it's kind of three plus one, actually. The second component is the FBI gratuitously saying that my client admitted to him that he was, had used marijuana at a previous occasion. Now, of course, to the government's credit, they acknowledged that they did not, they didn't know that was coming. And, of course, when the objection was made, motion to strike was not granted. I know Judge Haddon said, well, Judge Haddon at a later point said, just focus on the charge here. He's not charged with any other offense. But the problem is, when you're defending a child molestation case, that's the toughest case to defend. It's harder than a murder case. It's harder than anything. So any little thing is magnified. And so here marijuana is not the same thing as methamphetamine granted, but the fact that there's an admission of another illegal act is very damaging in my estimation, especially as I go forward because, in my view, how weak the evidence in this case really was. Now, the third component, the third section that I argue is where Judge Haddon, my client chose to waive his right and testified. And after he testified, Judge Haddon chose to ask some questions. What do you claim? What do you say he said? And, of course, we don't have audio like with the Ninth Circuit. You can get tone and demeanor and things of that nature. But it was strong. It was strong. Well, I read that part, but it doesn't seem to me that that was particularly offensive. Tell me again exactly what the context of that is. Well, Mr. Lemire Raymond had said that when he had previously denied the allegations made against him on two other occasions, one right after the allegations surfaced, the next time about a week later with FBI agent Edwards. So he comes in in May of 07, and he meets with Smidala, Agent Smidala, for a while. And Raymond essentially testified that Smidala told him, if you don't confess, you're going to go to prison for life. And he further testified that Agent Smidala would make him look like a serial child molester if he didn't confess. Now, I remind you, Raymond has an eighth-grade education, 19 years old, but an eighth-grade education, didn't finish ninth grade. So he gets on the witness stand and talks about this. I ask him, look the jury in the face. Did you do this? No. And, of course, Mr. Carroll cross-examines him. Then the judge decides he wants to ask questions. What do you claim he said? Something to that effect. What do you say he said? Again, I go back to the point, which is that with these child molestation cases, subtle things matter. And I don't think it was so subtle. The record, you can't tell if it's subtle or not, but it was strong. And then, of course, the question is to the FBI agent, Smidala, did you do this? And, of course, this all comes about, and I ask that the court consider this, in the context of the quality of evidence in this case, because I think that's where the rubber meets the road, Your Honors, because I understand the state thinks and alleges that the evidence was strong. The witness said he did it on the stand, and Raymond confessed at one point. But when you peel back the layers, there are three basic elements that show you that the evidence is very weak. First of all, this supposedly happened in a bed where there were two girls, one on each side of the complainant, in the dark. It supposedly was painful, and yet nobody awoke. And, of course, the two other girls testified and said they never heard anything. Raymond said, the confession, that he put a finger an inch and a half inside her vagina for about a minute. Nobody's awoken to that. There's no damage to the hymen, not even a little bit. And, of course, Dr. Maynard testified that you can have no damage and still have some penetration. But we know beyond that, that the complainant was in a bicycle accident, because at least she testified to that earlier that day, and another one of the children testified to that, and she hurt herself. And, of course, Dr. Maynard also testified that you would expect to see some injury, but not necessarily. Not necessarily. She said that on page 293 of the trial transcript. So we have also this notion of blood. It's not blood. It's suspected blood. The doctor and the nurse on the checklist, the rape kit, they said it was soil. They never checked off the box that was blood. The FBI sends it out presumptively for blood. They can't find a conclusive for blood. Why? Because it's either not blood or there's not enough of it. But we know they didn't test for stool, for feces, and we know Dr. Maynard noted stool in the perianal area. And we noticed, she also noticed that there was staining down the leg and a handprint, and they never tested. Fingerprints, they never tested to see if it was feces. And that's critical, because Dr. Maynard also said that poor hygiene could lead to scratching, and that's what could have, irritation, which could have caused whatever little bit of pain or a little bit of blood that there may have been in addition to the stool. The girl, the complainant, said it was poop, repeatedly. She later said that he was on top of her. She said she didn't remember what happened. She said his penis was in her. And so, of course, you have, it doesn't fit. His statement doesn't fit. Her statement doesn't fit. But at the end of the day, what you're complaining about are two questions that Judge Haddon asked to verify certain, the witness's testimony, right? I mean, that's where you started this discussion. Well, yeah. Not you're arguing sufficiency now. Well, but when you. . . I understand your larger point is you think it's a closer case. I think, I'm sorry to cut you off, Your Honor, but I think the point is that when you have those other three errors, plus you have this weak evidence, that's where those other errors, those three errors, even if you don't find in and of itself one of those or two of those does anything, but those errors combined with the weakness of the case clearly shows that Raymond's entitled to a new trial. You have just about three minutes left. Do you want to reserve? Yes, thank you very much. Mr. Carroll? Good morning, Your Honors. May it please the Court. Vince Carroll for the United States, and I was trial counsel in the district court in this matter. You have to speak up a little. Thank you. Is that better? Yeah. It's the government's position that none of the five issues that Mr. Lemire raises justifies reversing the sentence or the conviction in this matter, and any error by the trial court in this case is clearly harmless. The first, fourth, and fifth issues raised by Mr. Lemire are wholly without merit in the government's position, and I don't intend to address any of those issues unless the court has specific questions on those three particular issues. I think the other two issues, the second and third issue, merit some response from the United States, and I plan to address those. Regarding the marijuana issue, Judge Fletcher, I agree with your question, or at least the perception that you have as you read through the record in this case. There wasn't anything kind of a – I'm sorry. I agree that this information should not have come out. Quite frankly, it was an error on my part in preparing the witness for this testimony. But having said that, it did get before the jury, so should it have been struck? Looking at it at the time, I don't think even at the time that the – Why shouldn't the judge have stricken the testimony? That I don't understand. We can argue about harmlessness or so forth, but what's your justification for the judge not striking the testimony? If you look at it at the time it was offered, it arguably had some relevance as far as the defense that was raised, particularly with the defense to the confession. Mr. Yellen's defense or Mr. Lemire's defense in this case was that the defendant was coerced into making this statement, though it was not necessarily voluntary that the statement was made. If you look at it from that – at the time it was made, it was arguably a statement against interest. It had relevance towards the coercion element. But I would agree, if you look at it in hindsight, after you look at all the evidence that came out in the trial, how it played out, the defenses that were ultimately raised, the evidence that was presented, I would agree that the statement probably should have been struck. I guess I'd understand your response about the coercion element. How is marijuana use, past marijuana use, relevant to coercion or whether the statement was coerced or not? I think it goes to the element of when Mr. Lemire testified that Special Agent Spindola was coercing him into making these statements, he didn't – there was no allegation that he was coerced into making this statement about the marijuana. It was just a voluntary admission of criminal conduct. And so it could have been argued that, you know, given the fact that he admitted to this marijuana use, it shows that he was being voluntary, that he wasn't being coerced. And in addition to that, he admitted to sexually abusing this child. So that's, I think, how it arguably could have been relevant. It's not the strongest argument, I would concede that. But at the time the trial judge made the determination not to strike it, I don't know that that was error, given the circumstances of when it came in. Now looking at it in hindsight, I think it's a little different once you're able to see all the evidence that came out and how the trial progressed. But even assuming it was error, that the trial judge should have struck it, I mean, this is a, you know, the standard is, did the error more likely than not affect the verdict? And I think it's clearly harmless in that it was an isolated reference, and in fact it was the only reference to drug use in a two-and-a-half-day trial. The judge ruled on the objection quickly, did not allow the counsel to focus on this statement. There was no mention of the conduct later in the trial, and it wasn't relied upon by the prosecution during the closing arguments. There were six other witnesses that testified after this. So it was basically in the middle of the trial. It was early the second day of the trial when this information came out. And I set out in the brief the evidence. I would disagree with Mr. Yellen's assessment that the evidence was weak in this case. And finally, the trial court instructed the jury that the defendant was not on trial for, that he was only on trial for the conduct charged in the indictment and not for any other activity. So I think looking at this in the record, the total scheme of things, if it was error, it was harmless. It did not, more likely than not, affect the verdict. It seems to me that the evidence is very, very weak without the confession. I would agree that the evidence was circumstantial without the confession. But in looking at all of the evidence, I mean, there was evidence that this little girl had blood in her underwear. The mother testified, maybe. The mother testified that it appeared to be blood. And I would disagree with Mr. Yellen's assessment that there was no test done to, you know, the test showed that this wasn't blood. That's not, and I don't think that's necessarily correct. There was a presumptive. Well, what was correct? The presumptive test, the initial test that the FBI did, as testified to by the agent in the record, was that this initial test, it was tested positive or it was a presumptive test and that it was blood. And then the confirmatory test was basically, you couldn't tell because of either a lack of a sample or lack of sufficient sample or, as the defense counsel brought out, as Mr. Yellen brought out at the trial, that it wasn't, in fact, blood. That was the third reason that it didn't, this second test, the confirmatory test, wasn't positive, I guess. The consistency of the little girl's statement. Mr. Yellen says that the little girl said that this guy was on top of him, that his penis was in him, all these kinds of things. That's not necessarily, that's not what the little girl said. The little girl's testimony or statements were consistent throughout. Other people, like the little girl's mother. Didn't she say nothing happened or she couldn't remember when she was taken to the hospital? To one of the nurses. She wasn't consistent, absolutely, all the way through this. I don't know that the little girl said that nothing happened. She may have and I'm just not remembering that. But as far as, and again, all this information was presented to the jury. All the sufficiency argument that Mr. Yellen makes, he brought all this out in the trial. This was all brought out before the jury. And Mr. Lemire was convicted.  The confession was put to the jury. When we get to what the judge said. In questioning. Lemire was saying that this was really coerced. And the tape that was done didn't have any of the preambles. It just starts with. Yes, ma'am, the summary confession as the agent said. That they didn't tape all of it. But the question then is, did the judge really insert himself in a way that cast doubt on what Lemire was saying? No, ma'am, I don't think so. When you look at the record and the questions that were asked and the context of the questioning. I absolutely disagree with Mr. Yellen on this. That he says that the judge was strong. Do you have that part of the transcript there so you can read it to us? Yes, ma'am. I'm looking at excerpts of record 214 and the reporter's transcript, page 431. After Mr. Lemire testified. Would you like me to read the questioning? Yes, ma'am. And if I may just give a little context to this. This was the first time in this whole case when this information came out. We had a suppression hearing before this case started. And there was nothing about Mr. Lemire being coerced or threatened that came out in this suppression hearing. This was the first time that this information came out. And the court, questioning Mr. Lemire, said, well, Mr. Lemire, I have some questions. I want you to tell me what you say Agent Smidales said he was going to do with the judge that was somehow going to have something to do with your case. And then Mr. Lemire answers the question. And then the court says, so you say that he stated that he would make you look like a predator in front of me, correct? Yes, sir. And then he would say that you had molested all kinds of children. Yes, sir. And what else do you claim he said? That he would send me away for the rest of my life. That he would do that? Yes, sir. All right. You may step down. You may call your next witness. And then the court says, all right, Mr. Carroll, I want Agent Smidales produced. And then I respond. And the court says, all right, let's get him in here. If anything, from that exchange, it was that the court did not believe Agent Smidales or that Agent Smidales had kind of hidden the ball or said something that wasn't accurate to the court. The demeanor of the judge or the questioning there, as you read that, was that the court didn't believe Agent Smidales. And then Agent Smidales comes in and testifies, and then the judge asks him some questions. I think that goes to the heart of this, is that this was more of an even-handed kind of discussion. The judge was more matter-of-fact in questioning both witnesses. It's not the protracted, interrupting counsel going on and on about this that this court has found offensive or extreme to the point of reversing cases. In fact, one of the cases cited by Mr. Yellen in his brief, the Williams v. United States, the 1937 case from this court, you look at that case and over a third of the transcript, some 220 of the 600 and some odd pages, was the trial court questioning witnesses. And every single question that the trial court asked in that case was designed to help the prosecution. The court was sarcastic, questioning the defendants on and on and on, this kind of thing. And we don't have that in this case. This is the trial judge simply asking questions or framing questions, framing the issue for the jury. Well, what was the issue that the judge was framing for the jury? I think... Well, as you said, there's no issue of coercion, at least to this point. So, I mean, judges can ask clarifying questions, but I'm not sure I understand what the judge was after here, nor do I understand particularly why he would say, I want this agent called to testify. I think Judge Haddon was framing that issue for the jury. You have a testimony from the defendant that one thing was said, and then Judge Haddon, I think, was getting at, well, what is the agent going to say? Well, there are two possibilities, and they're both plausible. One is, as you said, that he was concerned about the agent's testimony and wanted him there. The second one was that he was going to make sure that the testimony was rebutted. And, Your Honor, as I've said in my response to Judge Haddon, it was obvious that when this information came out that I was going to call Special Agent Smidalla... Yes. ...to come in and rebut that, to do... But he apparently felt the need to encourage you to do that. Yes, Your Honor. I often need encouraging, I guess. I want the witness produced. Yes, Your Honor. That's what I said. You know, another disturbing part about this, I've listened to the transcript of the questioning of Lemire. Yes, ma'am. And they were almost feeding him the answer and asking him to agree with it. It's not a normal type of confession. I'm sure you've listened to it, too. Yes, Your Honor, I have. It's a very disturbing part of the case. They don't have any of the... They don't record anything until they go to the questioning. Yes, ma'am, or yes, Your Honor. And another thing in Judge Haddon's court is that the word polygraph is never to be mentioned. And that's kind of the thousand-pound gorilla that everybody's dancing around. Well, not only in Judge Haddon's court. I'm sorry? Not only in Judge Haddon's court. And it has a basis in the law. I'm not disagreeing with Judge Haddon on this. But this is the issue, I think, that was kind of in the forefront of everyone's mind, particularly Agent Smidala, because he testifies often in Judge Haddon's courtroom and he's a polygrapher for the FBI. And so that's kind of the issue everybody's dancing around. It doesn't get mentioned. Even, arguably, if the defendant opens the door to the information, it's not allowed to be brought up. And so that's kind of, I guess, the context in some of these recordings, is that they're careful not to mention the word polygraph or that a polygraph has taken place. But what happens in most circumstances, I suspect, is you have an informal interview, then a polygraph, and then the tape goes on in the confessional interview, right? That's the sequence? Yes, Your Honor. That's how these take place. And if there are no more... Any further questions? Thank you, Your Honor. Raymond Lemire is in jail for 30 years, and the point why I make that point is because the trial's got to be fair if you're going to send somebody to jail for a mandatory minimum of 30 years. And here, the notion that somehow, in hindsight, the marijuana discussion was inappropriate, but at the time it may have been appropriate, there was never a suggestion that Raymond was under the influence of marijuana by anybody at any time when he made this so-called confession. The marijuana should never have been introduced. It was gratuitously placed by the FBI agent because he's experienced. With relation to the oath, and I guess, Mr. Carroll, let me back up. Mr. Carroll brought out the fact the jury heard all the inconsistencies, but they also heard the court saying to Mr. Lemire, what do you claim he said? What do you say he said? And then, of course, when Smidalla got up there, he said, did you? Did you say this? The jury heard that. They heard the inconsistencies, but they also heard that. The jury also heard the marijuana. They didn't need to hear that marijuana. With relation to this, the complainant was consistent. She claimed it was poop. She claimed it was poop until her parents didn't believe her. The father had been drinking. They were upset because she was nowhere to be found. She shouldn't have been over there. Her clothes are dirty and it's a ruckus. She says it's poop. She repeatedly says it. And then, of course, it's not. Mother suspects it's blood. The doctor doesn't note it's blood. I want to bring out another point. The state, the government's DNA expert, their forensic scientist, they're the one who said we didn't conclusively find it was blood because it may not have been blood to begin with. And I agree with Your Honor Fletcher that the case was weak, even with the confession, because Raymond had repeatedly denied. And we had this four-minute and 20-second statement. And, Your Honor, I appreciate on behalf of Raymond. And when I told Judge Haddard's sentencing, Raymond's lost, he's lost. Thirty years on this record is not justice. Thank you. Thank you, counsel. The case has certainly been submitted. It's quite a personal privilege. It's nice to see what Montana attorneys are doing here today. So thank all of you for appearing.
judges: Fletcher B. , Tashima, Thomas